IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                          CRIMINAL ELH-12-00458

JOSEPH MCKINSEY BROWN,
*Defendant.*

**MEMORANDUM OPINION**

Defendant Joseph McKinsey Brown, who is self-represented, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 231. He has also filed a supplement. ECF 247. I shall refer to defendant's submissions collectively as the "Motion."[1] The government opposes the Motion. ECF 236 (the "Opposition"). The Opposition is supported by several exhibits. ECF 236-2 to ECF 236-6. Defendant has replied. ECF 238 (the "Reply").

Brown entered a plea of guilty in November 2012 to the offenses of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §846 (Count Two), and possession of a firearm in furtherance of a crime of violence, in violation of Title 18 U.S.C. §922(c) (Count Three). ECF 40. Notably, the predicate offense for Count Three was Hobbs Act conspiracy under 18 U.S.C. §1951(a), as charged in Count One. Judge William Quarles, Jr., to whom the case was initially assigned, sentenced Brown in March 2013 to an agreed upon total term of 180 months of imprisonment. ECF 52 (Judgment).

The case was reassigned to me in 2016, due to the retirement of Judge Quarles. *See* Docket. In November 2019, I granted post-conviction relief to Brown. In particular, I vacated the judgment

---

[1] The Office of the Federal Public Defender has declined to supplement the Motion or to represent Brown. ECF 234.

of conviction as to Count Three, as well as the sentence imposed for Count Two, in light of *United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319 (2019), and other cases.  This was because  Hobbs Act conspiracy (Count One) was not a qualifying predicate for the § 924(c) offense (Count Three).

Sentencing was held on March 3, 2020.  ECF 176.  I sentenced Brown to a total term of 162 months of imprisonment, with credit for time served in federal custody since August 15, 2012. ECF 182.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, in part.

## I.      Procedural and Factual Background

Brown and two others were indicted on August 23, 2012.  ECF 18.[2]  Brown was charged with Hobbs Act conspiracy, in violation of 18 U.S.C. §1951(a) (Count One); conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of Title 21, U.S.C. §846 (Count Two); possession of a firearm in furtherance of a crime of violence, *i.e.*, conspiracy to commit Hobbs Act robbery, in violation of Title 18, U.S.C. §924(c) (Count Three); and possession of a firearm by a convicted felon, in violation of Title 18, U.S.C. §922(g)(1) (Count Four).  As mentioned, Count One served as the predicate offense for Count Three.

Pursuant to a Plea Agreement (ECF 40), defendant entered a plea of guilty on November 5, 2012, to Count Two and Count Three of the Indictment. ECF 39.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), by which the parties agreed to a sentence of ten years

---

[2] Brown was arrested on August 15, 2012, and has been incarcerated since that date. ECF 46 at 1.

(120 months) as to Count Two,[3] and five years (60 months), consecutive, for Count Three, for a total sentence of fifteen years of imprisonment (180 months).  *Id.* ¶ 7(d).

The Plea Agreement contained a lengthy factual stipulation.  It stated, ECF 40, ¶ 7(a):

In July 2012, the Defendant, Joseph Brown met with a confidential source of information (the CS) working for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") at a location in Baltimore City, Maryland. The CS told the Defendant that he knew of the location of a narcotics "a stash house" that regularly contained as much as 10 to 14 kilograms of cocaine. The CS explained that he and an associate (a disgruntled drug courier, who was actually an ATF undercover agent (UC)) planned to rob the stash house and would provide half of the stolen cocaine (that is, as much as 7 kilograms) to whomever helped them commit the robbery. The Defendant agreed to commit the robbery and indicated that he (the Defendant) had a crew of individuals capable of committing the robbery. The Defendant then arranged for the UC and CS to meet the other members of his crew.

On August 14, 2012, the CS and the UC met with the Defendant and his conspirators, CC# I and CC#2, and discussed the robbery. During the conversation the UC explained that he (the UC) was a courier of cocaine for a drug trafficking organization and he usually picked up two kilograms of cocaine at a time then delivered it north. The UC said there were always at least ten (I0) kilograms of cocaine in the residence that were pressed, wrapped, stamped, and stored in a Styrofoam cooler. The UC continued to tell everyone the cocaine was guarded by at least two and possibly three armed individuals who usually carried handguns but occasionally had an AK-47. CC#1 then told the UC, "We (the conspirators) was debating on about waitin' for you (the UC) to come out and full blitzin, just start sprayin the door down, kickin' it open ... You know that make them want to come out the back door. When they come out the back, we be waiting to come through the back." CC#1 then said "We got the chopper (a street term for an AK-47), once we hit the door by the locks it's gonna pop straight off. Kick the bitch in and start letting off they gonna, that gonna blow em out." Immediately, following CC#l 's statements, CC#2 stated, "We hitt'n the door with a K (the AK-47)," while CC#1 imitated the sound ofan automatic weapon, CC#2 continued, "as soon as you (referring to another conspirator) spray we in there." CC#2 further stated, "As soon as you (referring to the same conspirator) go in, two of us is goin straight to the backdoor."

On August 15, 2012 at approximately 8:05 a.m., the CS drove to the McCulloh homes area of Baltimore and picked up the Defendant and his conspirators in anticipation of the planned robbery. The CS then drove the Defendant and his conspirators, to meet the UC at a gas station on Russell Street.

---

[3] On occasion, the Plea Agreement erroneously references Count One, rather than Count Two.  *See*, *e.g.*, ECF 40, ¶ 7(b).

While at the gas station, the UC explained the he (the UC) was nervous because he (the UC) did not think that they (the conspirators) were going to go through with the robbery. All three conspirators, including the Defendant, then acknowledged that they were ready. The CS then drove the three conspirators, followed by the UC, who was in a separate vehicle, to a storage facility under the guise of obtaining a minivan that the conspirators had requested the CS provide to commit the robbery. Once at the facility, everyone exited their respective vehicles, and waited for the UC to receive the call to pick up the drugs. As they waited, the arrest signal was given by the UC and agents approached to arrest all three conspirators. Each conspirator attempted to flee, but was quickly apprehended. In the process of their flight, CC#2 discarded a Jennings 9mm handgun; CC#1 threw a Ruger .45 caliber handgun onto the roof of the storage facility; and the Defendant threw a Ruger 9mm onto an adjacent roof of the same facility. All three firearms were loaded. During a search conducted incident to their arrest, recovered from the CC#2 was a pair of black rubber gloves and black balaclava; from CC#1 was a black ski mask rolled on top of his head; and from the Defendant was a pair of black rubber gloves and a black ski mask.

The parities [sic] stipulate that the Defendant and his conspirators intended to commit a robbery of the stash location with the use of the firearms in their possession, and intended to distribute the more than five kilograms of cocaine that was alleged to have been stored in the location. The parties further stipulate that cocaine is a commodity manufactured outside the state of Maryland and travels in interstate commerce. As such the conspirators, including the Defendant, possessed firearms in furtherance of a robbery, a crime of violence, that would have interfered with the interstate commercial activity of narcotics trafficking.

Count Two carries a maximum penalty of life imprisonment with a mandatory minimum term of ten years of imprisonment. Count Three carries a maximum penalty of life imprisonment with a mandatory minimum term of five years imprisonment, consecutive. ECF 40, ¶¶ 3, 7(b).

In the Plea Agreement, the parties stipulated that there was no agreement as to defendant's criminal history or criminal history category under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 8. The parties also agreed to a base offense level of thirty-two for Count Two, pursuant to § 2D1.l(c)(4) of the Guidelines, because the defendant conspired to distribute and possess with intent to distribute at least five kilograms but less than 15 kilograms of cocaine. And, pursuant to the Guidelines, the parties agreed that Count Three had Guidelines of 60 months, consecutive. *Id.* ¶ 7(b). Further, the parties contemplated a three-level reduction for

4

acceptance of responsibility under U.S.S.G. § 3E1.1. *Id.* ¶ 7(c).  As a result, the parties anticipated a final offense level of 27 for Count Two, and 60 months of imprisonment, consecutive, for Count Three.

The Presentence Report (ECF 46, "PSR") indicates that Brown qualified as a career offender under U.S.S.G. § 4B1.1 because he had a combination of at least three prior and distinct felony drug convictions or convictions for crimes of violence.  *Id.* ¶ 25.  The predicate offenses are found in ECF 46, ¶¶ 36, 38, 41.  As a result, under U.S.S.G. § 4B1.1, the PSR set forth an offense level of 37 for Count Two.  *Id.* ¶ 27.  After deductions for acceptance of responsibility, defendant had a final offense level of 34.  *Id.*

In particular, Brown had two prior drug offenses that were prosecuted in Juvenile Court. ECF 46, ¶¶ 30, 31.  He was adjudicated a delinquent in both cases.  In addition, Brown had five prior adult criminal convictions, all of which scored points.  *Id.* ¶¶ 33-47.  In particular, in 2000, at the age of sixteen, defendant was convicted of a handgun offense and was sentenced to a suspended two-year term. In 2003, at the age of twenty, defendant was convicted of two separate felony drug offenses and was sentenced to seven years of incarceration, most of which was suspended.  *Id.* ¶ 36, 38.  In 2002, at the age of twenty-two, defendant was found guilty of robbery and was sentenced to six years of imprisonment. *Id.* ¶ 41.  At the age of twenty-six, in 2009, defendant was again convicted of a felony drug offense and was sentenced to thirty months of imprisonment. *Id.* ¶ 45.

In sum, Brown had 14 criminal history points.  This equates to a criminal history category of VI.  *Id.* ¶ 48.  Alternatively, as a career offender, the defendant also had a criminal history category of VI.  *Id.*

With a final offense level of thirty-four and a criminal history category of VI, the

Guidelines called for a period of incarceration for Count Two, ranging from 262 to 327 months, plus 60 months, consecutive, as to Count Three. *Id.* ¶ 59. Thus, the total under the Guidelines called for a sentence ranging from 322 to 387 months of imprisonment.

Sentencing was held on March 27, 2013. ECF 52. At the time of sentencing, defendant was twenty-nine years old. ECF 46 at 1. Defendant is 5'11" tall and he weighed approximately 200 pounds. *Id.* ¶ 77. The PSR also reflected that defendant had a long history of substance abuse, beginning with marijuana at age fifteen and Ecstasy and alcohol, beginning at age seventeen. *Id.* ¶¶ 78, 79. Brown participated in Narcotics Anonymous and as a juvenile he completed a drug program. *Id.* ¶ 79.

Judge Quarles sentenced defendant to 180 months of incarceration, pursuant to the C Plea. ECF 52. The Court also imposed a term of five years of supervised release. *Id.* No appeal was taken by the defendant.

Through the Federal Public Defender ("FPD"), defendant filed a post-conviction petition in June 2016, pursuant to 28 U.S.C. § 2255 (ECF 101), as well as several subsequent supplements. ECF 106, ECF 122, ECF 132. He relied, *inter alia*, on *United States v. Davis*, 139 S. Ct. 2319 (2019); *Sessions v. Dimaya*, ___ U.S. ___, 138 S. Ct. 1204 (2018); and *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc). In its response (ECF 147), the government agreed that the Hobbs Act conspiracy in Count One, under 18 U.S.C. § 1951(a), categorically failed to qualify as a crime of violence under the force clause of 18 U.S.C. § 924(c).

By Order of November 6, 2019 (ECF 156), I granted Brown's petition to vacate the judgment of conviction as to Count Three. And, I vacated the sentence imposed for Count Two. *Id.*

An Amended PSR was prepared. ECF 181. It reflected a final offense level of twenty-

nine as to Count Two and a criminal history category of VI. *Id.* ¶¶ 29, 46. The revised Guidelines called for a period of incarceration for Count Two ranging from 151 to 188 months. *Id.* ¶ 56.

As indicated, another sentencing was held on March 3, 2020. ECF 176. As to Count Two, I sentenced Brown to 162 months of imprisonment. ECF 182 (Second Amended Judgment).

Brown subsequently submitted two motions for compassionate release. I denied Brown's initial motion (ECF 189) as he had not exhausted his administrative remedies. ECF 197. I denied Brown's second motion, without prejudice (ECF 199), as he did not submit evidence showing the extent of his medical conditions that allegedly rendered him vulnerable to COVID-19. ECF 214. Brown appealed. ECF 217. The Fourth Circuit dismissed the appeal. ECF 229.

Brown is currently 39 years old, and he is incarcerated at FCI McKean. *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited January 25, 2023).[4] The Bureau of Prisons ("BOP") indicates that he has a projected release date of June 3, 2024. With credit for pretrial detention dating from August 29, 2008, defendant has served about 145 months of his 162-month sentence, or approximately 89% of his revised sentence.

Brown submitted a request to the Warden for a reduction of sentence based on "concerns about contracting COVID-19 due to [his] underlying health conditions." ECF 236-2. That request was denied on September 20, 2021. *Id.* This Motion followed on September 16, 2021. ECF 231.

Defendant seeks a reduction of his sentence to time served, based on a combination of factors, including his underlying medical conditions, in combination with the COVID-19

---

[4] At the time of the filing of the Motion, defendant was incarcerated at FCI Hazelton. ECF 231 at 4.

pandemic.[5]  In particular, defendant asserts that he suffers from obesity, asthma, hypertension, chronic shortness of breath, and has hypertension.  ECF 231 at 2. In addition, defendant complains of his need for surgery as to a bullet lodged in his right knee. *Id.* Further, Brown asserts that he needs to provide care to his thirteen-year-old daughter, as her mother recently passed away. ECF 247.[6]

The government concedes that Brown "presents with certain [COVID-19] risk factors." ECF 236 at 22. But, the government notes that Brown is fully vaccinated and his risk for serious medical conditions from COVID are dramatically reduced. *Id.*  According to defendant's medical records, Brown received his second dose of the Pfizer vaccine on March 30, 2021.  ECF 236-5. The government also argues that the medical complaints the defendant alleges are not supported by his attached medical records, and defendant "seems to have declined some treatments and medicines." ECF 236 at 1.[7]  In any event, the government argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of relief.  *Id.*

Additional facts are included, *infra*.

---

[5]  Brown's initial motion (ECF 236) requested either compassionate release or the appointment of counsel to assist with the matter, and Brown's supplemental filing indicated that he requests immediate release (ECF 247).

[6] The government appears to contest that Brown has exhausted his administrative remedies. ECF 236 at 6. However, the Warden denied Brown's request on September 20, 2021 (ECF 236-2).  The subsequent reviews by this Court did not reach the merits.  Further delay is not appropriate.

[7] The government also bases its argument on the allegation that Brown, at one point, refused to take medication for hypertension. ECF 236 at 23. The issue appears to be moot.  *See* ECF 263-3 at 2 ("Have reviewed previous blood pressure with Im and showed him the blood pressures values used to demonstrate Highs Blood Pressure. Im finds understanding in our conversation and the charts he has seen. He agrees it is time to take medication and control blood pressures.").

## II.     Appointment of Counsel

The FPD has declined to represent Brown in this matter.  ECF 234.  Brown asks the Court to appoint counsel for him. ECF 231 at 5.

There is no constitutional right to appointed counsel in this proceeding.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").   Rather, the determination to appoint counsel rests solely within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Brown has ably demonstrated the ability to articulate the legal and factual basis of his claims.   And, a review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel.

Therefore, I shall deny defendant's request for counsel.

## III.     Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)).  *Malone*, 57 F.4th at 173.   Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  *Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment

"upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 54 F.4th at 831.  And, the court must conclude that the movant satisfies both criteria.  *Id.*; *see Hargrove*, 30 F.4th at 194-95.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis."  *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to

11

reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[8] In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

---

[8] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See*, *e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam). Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Id.* at 2396; *see United States v. Reed*, ___ F.4th ___, 2023 WL 1163109, at *4 (4th Cir. Jan. 31, 2023); *Brice*, 2022 WL 3715086, at *2.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And,

14

compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry. The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers

a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments."  *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at ___.  That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *3 (4th Cir. Jan. 18, 2023); *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion."  *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."; *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

## IV.    COVID-19[9]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[10]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

---

[9] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[10] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of February 6, 2023, COVID-19 has infected more than 102.5 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed February 6, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. And, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In January 2023, the CDC updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (January 26, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness

from COVID-19 increases as the number of underlying medical conditions increases in a person."
*People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed January 30, 2023). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention

facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[11]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL,

---

[11] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

22

2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

Notably, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months*

*to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of February 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 95% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated February 1, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated February 1, 2023); Moreover, approximately 52 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated January 25, 2023).

Federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999. Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna

24

for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.   Much has changed since that time.

As of February 6, 2023, the BOP had 145,867 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 347,206 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last accessed February 6, 2023).

## D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on

Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021,  https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION,  https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021),  https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

26

But, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

Unfortunately, we soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Nov. 12, 2022).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html

("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").   In other words, we are in "a more endemic phase of this crisis . . . ."   *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).   Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.   Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).   He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*   On the other hand, news reports suggested that we could experience another surge of cases in the coming months.   *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter Covid-19 surge*, CBS NEWS (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

It appears that "virus metrics have stabilized."   Standing Order 2022-05.   And, as Chief Judge Bredar of this Court recently noted, in consultation with the court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."   *Id.*

With respect to the BOP, it has reported that, as of February 6, 2023, 114 federal inmates, out of a total population of 145,867, and 117 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.   Moreover, 46,384 inmates and 15,040 staff have recovered from the COVID-19 virus.   In addition, 314 inmates and seven staff members have died from the virus.   The BOP has completed 128,642 COVID-19 tests.   *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI McKean, where the defendant is imprisoned, the BOP reported that as of February 6, 2023, out of a total of 1,103 inmates, zero inmates and zero staff members have

currently test positive, zero inmates and zero staff members have died of COVID-19, and 378 inmates and 58 staff have recovered at the facility. In addition, 58 staff members and 1,015 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/mck/ (last visited February 6 , 2023).

## V.  Discussion

As stated, Brown argues that extraordinary and compelling circumstances warrant compassionate release. He relies on his medical conditions, in combination with the need to care for his minor child. ECF 231; ECF 247.

Brown's medical records indicate that he suffers from three conditions that the CDC identifies as risk factors for a more serious case of COVID-19. In particular, Brown's medical records reflect a BMI of greater than 30. On October 10, 2021, Brown weighed 248 pounds. ECF 236-3. Given that his height is listed as 5'11" in the PSR, his BMI at the time of his medical examination was 34.6. *Adult BMI Calculator*, CENTER FOR DISEASE CONTROL, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited January 25, 2023). This qualifies him as obese under the CDC guidelines. He also has hypertension and asthma. ECF 236-3.

In light of the pandemic, some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release. *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese

29

defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Dawson*, ADM-18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on the defendant's obesity). And, some courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

Moreover, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Brown. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Hilow*, JD-15-170, 2020 WL 2851086, at *4 (D.N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding

30

defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, CR-08-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

Brown has received two doses of the COVID-19 vaccine. ECF 236-5 at 1. To be sure, the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus. But, they are not entirely effective, particularly as to the latest variants. Indeed, "[t]he variants have shown a remarkable ability to get around the protection offered by infection and vaccination." Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022).

Moreover, the CDC issued recommendations encouraging everyone ages 5 years and older to receive a COVID-19 booster shot 2 months after completing primary COVID-19 vaccination (*see COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3MdQMM6 (last updated January 25, 2023)) and, all adults ages 50 years and older are eligible for a second booster shot. *Id.* Yet, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

In addition, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17,

2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed January 30,

2023).  An analysis of "nationwide data from the Center for Disease Control and Prevention"

revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,]

during the highly contagious omicron variant's surge, compared with 23 percent of the dead in

September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer*

*overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022),

https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Therefore, the fact of defendant's vaccination does not eliminate concerns about

underlying health conditions that might otherwise render an individual eligible for compassionate

release.  Accordingly, that Brown has been vaccinated against COVID-19 "does not negate that

his underlying health conditions make him eligible for compassionate release."  *United States v.*

*Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

Further, several judges of this Court have concluded that an inmate is eligible for

compassionate release, notwithstanding vaccination status.  *See e.g.*, *United States v. Hegie*, RDB-

14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19

pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an

extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL

356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the

COVID-19 pandemic and the absence of any information concerning the inmate's vaccination

status, defendant's underlying medical conditions qualified as an extraordinary and compelling

reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan.

4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent

urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, AJT-19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

In sum, I am satisfied that defendant satisfies the "extraordinary and compelling" prong of the § 3582 analysis, based on his medical conditions.

In his supplement, Brown also argues that his family circumstances support a finding of compelling and extraordinary reasons to reduce his sentence. ECF 247. Specifically, Brown claims that his daughter's mother died in September 2020 and that his thirteen-year-old daughter needs him as a parent in her life. *Id.* at 1.

Relevant here, the commentary to U.S.S.G. § 1B1.13 provides that either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" may constitute a compelling reason for the defendant's release. U.S.S.G. § 1B1.13 cmt.1(C).

Brown did not proffer medical or death records to substantiate this claim. But, I need not resolve this issue, because I have already determined that defendant has established eligibility based on his medical conditions.[12] Therefore, I turn to the next step in the analysis.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even

---

[12] I note that, in the absence of evidence that a prisoner is the sole available caregiver for his or her minor child or incapacitated spouse, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A). *See, e.g.*, *United States v. Johnson*, 13-00082 (KSH), 2021 WL 3260847, at *4 (D.N.J. Jul. 29, 2021); *United States v. Tucker*, 3:14-CR-0367-B-84, 2021 WL 977100, at *1 (N.D. Tex. Mar. 15, 2021); *United States v. Tyler*, Crim. No. 09-391, 2021 WL 736467, at *4 (E.D. La. Feb. 25, 2021); *United States v. Bolden*, CR-16-320-RSM, 2020 WL 4286820, at *5 (W.D. Wash. Jul. 27, 2020).

when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See Bethea*, 54 F.4th at 834; *High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

The government argues that defendant is a danger to the community, citing, *inter alia*, the seriousness of his offense. ECF 236 at 31.  Moreover, it points to this Court's resentencing in March 2020, by which the Court reduced the defendant's C-Plea sentence from the agreed upon term of 180 months (ECF 40, ¶ 7(d)) to 162 months.  *Id.*  And, the government notes that defendant "accrued several administrative infractions" during his incarceration.  *Id.*; *see* ECF 236-5.

There is no doubt that defendant's crime was extremely serious, as he played a significant role in a drug conspiracy that involved a plan to rob a stash house, significant quantity of cocaine, and firearms.  Furthermore, Brown has a significant criminal history. The criminal justice system was generally lenient with Brown and, on several occasions, he violated his probation.  *See*, *e.g.*, ECF 46, ¶¶ 33, 36, 38.

Defendant has made efforts to rehabilitate himself.  This includes obtaining his GED, participating in programs, and working in vocational positions where he learned skills relevant to food service and maintenance.  ECF 247 at 1-2.  *See Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his

34

initial sentencing."); *McDonald*, 986 F.3d at 410-12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

In considering the Motion, I am mindful that courts consider a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts). Brown's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). But, rehabilitation alone does not warrant defendant's immediate release. *Davis*, 2022 WL 127900, at *1.

Despite defendant's efforts towards rehabilitation, he has had a series of infractions while in custody. They include two assaults of other inmates (October 2016 and December 2013); fighting with another person (May 2013); and refusing to obey an order (May 2013). *Id.* I note, however, that the most recent documented infraction occurred more than six years ago.

I am mindful that some of defendant's incarceration occurred in the midst of the global pandemic, which generally has "increased the severity of the sentence beyond what was originally anticipated . . . ." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4,

2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary"). Indeed, this cuts against the government's assertion that it is "hard to fathom a change in circumstance" between Brown's resentencing in March 2020 and his Motion in September 2021 that would justify a change in sentence. ECF 236 at 31. Incarceration throughout a global pandemic certainly constitutes a change in circumstance.

The government also expresses concern about the danger posed to the community, and as to Brown's lack of a verified release plan, including his inability to secure "stable housing and gainful employment." ECF 236 at 29-30. I note that Brown's initial motion was unclear as to his employment prospects and where he would live. ECF 231. However, Brown now avers that his family will assist him with obtaining employment, and that he has "signed [his] halfway house papers," which indicates that he will have work opportunities and a place to reside upon release. ECF 247 at 2.

Given the gravity of Brown's underlying offense, the need to promote respect for the law, Brown's prior record, and his infractions while in custody, immediate release is wholly unwarranted.  However, Brown's medical conditions, coupled with defendant's rehabilitation efforts, family circumstances, and the challenges posed by the pandemic, combine to create a basis for a reduction of defendant's sentence.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of

36

the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, 461 F.Supp.3d 343, 352 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction from 162 months to 150 months is reasonable in light of the circumstances of this case. Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

## VI.   Conclusion

For the reasons stated above, I shall grant the Motion, in part.  Brown's sentence shall be reduced from 162 months to 156 months of imprisonment.  The terms and conditions of supervised release to which Brown was originally sentenced will remain in place. Further, I shall deny Brown's request for the appointment of counsel.

An Order follows, consistent with this Memorandum Opinion.


Date: February 8, 2023                          _____/s/_____
                                                Ellen L.  Hollander
                                                United States District Judge